Herman Wayne SHERMAN, Appellant,

v.

The STATE of Texas, Appellee.

No. 63286.

Court of Criminal Appeals of Texas,
En Banc.

Nov. 4, 1981.

Rehearing Denied Dec. 23, 1981.

Martha McCabe, Tyler, for appellant.

Hunter B. Brush, Dist. Atty. & William M. Routon & Dale Paul Summa, Asst. Dist. Attys., Tyler, Robert Huttash, State's Atty., Austin, for the State.

## OPINION

ROBERTS, Judge.

The appellant entered a plea of not guilty before a jury to the offense of mass picketing under V.A.C.S., Art. 5154d, Sec. 1(2). He was convicted and the jury assessed his punishment at a fine of $25.00, probated.[1]

The complaint and information charged that the appellant:

> "... did, then and there unlawfully knowingly and intentionally engage in mass picketing, to-wit: the said Herman Wayne Sherman, did then and there knowingly and intentionally by his person constitute an obstacle to the free ingress to and egress from the entrance to premises then being picketed, to-wit: Buddy Schoellkopt Products, by obstructing said free ingress and egress by his person; against the . peace and dignity of the State."

Article 5154d, V.A.C.S., makes it unlawful for any person to engage in mass picket-

---

1. On original submission, a panel of this Court noted that the record was before the Court without a transcription of the court reporter's notes or bills of exception and that no brief had been filed in the trial court in the appellant's behalf pursuant to Article 40.09, subdiv. 9, V.A. C.C.P. The panel found nothing which would require its review in the interest of justice under Article 40.09, subdiv. 13, V.A.C.C.P. The panel then affirmed the conviction. 592 S.W.2d 643.

The appellant timely filed a motion for rehearing wherein he established that the record had been prematurely approved by the trial court on the same date that the Clerk gave notice of completion of the record to the parties. The record was then prematurely forwarded to this Court without an opportunity for the appellant to file a transcription of the court reporter's notes or to timely file a brief.

We entered an order abating the appeal and returned the case to the trial court so that a new notice of completion of the record might be given and further proceedings had under Article 40.09, V.A.C.C.P.

The record having been completed in accordance with the cited statute, the appeal has been reinstated and the case is now properly before the Court for determination.

ing when, in the language of Section 1, subdiv. 2, of said statute:

"2. Pickets constitute or form any character of obstacle to the free ingress to and egress from any entrance to any premises being picketed or to any other premises, either by obstructing said free ingress or egress by their persons or by the placing of vehicles or other physical obstructions."

One convicted of a violation of the statute is subject to a fine of not less than $25 nor more than $500 or to imprisonment not to exceed 90 days, or both. V.A.C.S., Art. 5154d, Sec. 5.

Buddy Schoellkopt Products, Inc., is a corporation engaged in manufacturing "marine safety equipment and down-filled type hunting clothes," operating a plant in Tyler which employs about one hundred ten persons. The company also has plants in Dallas and Mineola, Texas, and one in the State of Alabama. The manager of the Tyler plant, Jeff Keasler, testified that United Rubber Workers Union, Local 746, had become interested in the employees at the Tyler plant, and his company became "engaged in differences" with the Union.

The Union went on strike February 8, 1979, and set up pickets at the entrances to the plant. The appellant testified that he was employed by Kelly Springfield Tire Company in Tyler and was vice-president of Local Union 746, United Rubber Workers, which had about twelve hundred members.

He began walking the picket line at Schoellkopt the day after the strike began and participated in the picketing upon several occasions thereafter. He was walking on the picket line on the street in front of the factory at the time he was arrested.

Lt. Adams of the Tyler Police Department was in charge of a detail of four officers who came to the picket line in two cars accompanied by a "paddy wagon" for use in transporting any persons arrested to the city jail. He said that he told appellant not to obstruct cars leaving the plant but appellant walked slowly in front of at least one car causing it to stop momentarily to avoid striking appellant. Adams immedi-

ately ordered appellant's arrest, and he was taken to the jail in the waiting paddy wagon.

Three other police officers gave similar testimony and we quote verbatim the account of Officer Grage who testified that while appellant was "carrying a picket sign at the entrance to the plant and was walking back and forth picketing the entrance":

"[He] was walking, what we termed a half step, not taking a full step as he walked through the driveway. And as he walked in front of a vehicle that was exiting the plant, shortened his steps even more coming to a very slow, you know, snail's pace."

When Lt. Adams ordered appellant's arrest, Officer Grage "took the Defendant's picket sign and marked down [on it] a license number of the vehicle he had obstructed."

There is no evidence of any act of violence by the appellant or any of the other persons in the vicinity of the picket line and the plant entrance. Indeed, State's counsel does not contend that there was any violence or threat of violence at the time of the arrest. Nor is there evidence that traffic out of the plant or on the adjacent street was stopped. The driver of the automobile which was required to pause briefly, under the State's version of the facts, did not testify.

I.

In his sixth ground of error, the appellant contends that the trial court erred in overruling his motion to dismiss for want of jurisdiction. The gist of this contention is that state court jurisdiction over this type of case has been pre-empted by the National Labor Relations Board. We do not agree.

The appellant correctly recognizes the general rule regarding pre-emption of state court jurisdiction in the field of labor relations. As announced in *San Diego Building Trades Council v. Garmon*, 359 U.S. 236, 79 S.Ct. 773, 3 L.Ed.2d 775 (1959), that rule is:

"When it is clear or may fairly be assumed that the activities which a State purports to regulate are protected by Sec. 7 of the National Labor Relations Act [29 U.S.C. Sec. 157], or constitute an unfair labor practice under Sec. 8 [29 U.S.C. Sec. 158], due regard for the federal enactment requires that state jurisdiction must yield. To leave the states free to regulate conduct so plainly within the central aim of federal regulation involves too great a danger of conflict between power asserted by Congress and requirements imposed by state law." 359 U.S. at 244, 79 S.Ct. at 779.

A number of civil cases in Texas have given effect to this general rule. See, e.g., *Ex parte Twedell*, 158 Tex. 214, 309 S.W.2d 834 (1958); *Dallas General Drivers, Warehousemen and Helpers, Local 745 v. Central Beverage, Inc.*, 507 S.W.2d 596 (Tex.Civ. App.—Dallas, 1974, writ ref'd n. r. e.); *San Antonio Bldg. and Construction Trades Council v. Warrior Constructors, Inc.*, 466 S.W.2d 815 (Tex.Civ.App.—San Antonio 1971, no writ); *International Ass'n of Machinists and Aerospace Workers v. Stephens*, 437 S.W.2d 917 (Tex.Civ.App.— Beaumont 1969, no writ).

However, the recognition of the general rule is only the beginning of our analysis. The United States Supreme Court has recognized a number of exceptions to the *Garmon* rule.

In *Motor Coach Employees v. Lockridge*, 403 U.S. 274, 91 S.Ct. 1909, 29 L.Ed.2d 473 (1971), the Court recounted the considerations which led Congress to enact the National Labor Relations Act.[2] Concerned with the inability of the individual states to stabilize industrial relations, Congress created a general national labor law. In addition, it created the National Labor Relations Board with primary responsibility for the administration and enforcement of a uniform national labor policy. The principle of pre-emption was applied by the Court to eliminate conflict between judicial and administrative decisions interpreting federal labor policies.

However, that principle has been limited by the Court. Without specific congressional direction, the Court has been unwilling to "declare pre-empted all local regulation that touches or concerns in any way the complex interrelationships between employees, employers, and unions." *Id.* at 289, 91 S.Ct. at 1919.

In attempting to reconcile the general principle and its limitations the Court tried various approaches.

"Thus, for example, some early cases suggested the true distinction lay between judicial application of general common law, which was permissible, as opposed to state rules specifically designed to regulate labor relations, which were pre-empted. See, *e.g.*, *Automobile Workers v. Russell*, 356 U.S. 634, 645 [78 S.Ct. 932, 939, 2 L.Ed.2d 1030] (1958). Others made pre-emption turn on whether the States purported to apply a remedy not provided for by the federal scheme, *e.g.*, *Weber v. Anheuser-Busch, Inc.*, 348 U.S. 468, 479– 480 [75 S.Ct. 480, 487–488, 99 L.Ed. 546] (1955), while in still others the Court undertook a thorough scrutiny of the federal Act to ascertain whether the state courts had, in fact, arrived at conclusions inconsistent with its provisions, *e.g.*, *Automobile Workers v. Wisconsin Employment Relations Bd.*, 336 U.S. 245 [69 S.Ct. 516, 93 L.Ed. 651] (1949)." *Id.* at 290–291, 91 S.Ct. at 1919–1920.

Each of these approaches was rejected either because it required case-by-case determinations or because it sacrificed uniformity of federal law.

The failure of these earlier approaches and the necessity of effectuating congressional purposes then led to the creation of the *Garmon* rule.

However, even as the Court set forth a broadly stated rule, it noted two types of exceptions: cases "where the activity regulated was a merely peripheral concern of the Labor Management Relations Act . . . [and] . . . where the regulated conduct

---

2. See generally Part II–B of the *Lockridge* opin- ion, 403 U.S. at 285–291, 91 S.Ct. at 1917–1920.

touched interests so deeply rooted in local feeling and responsibility that, in the absence of compelling congressional direction, we could not infer that Congress had deprived the states of the power to act." *San Diego Building Trades Council v. Garmon*, 359 U.S. 236, 243–244, 79 S.Ct. 773, 778–779, 3 L.Ed.2d 775 (1959).

Other exceptions have been recognized "where Congress has affirmatively indicated that such power should exist . . . and where the particular rule of law sought to be invoked before another tribunal is so structured and administered that, in virtually all instances, it is safe to presume that judicial supervision will not disserve the interests promoted by the federal labor statutes." *Motor Coach Employees v. Lockridge*, 403 U.S. 274, 297–298, 91 S.Ct. 1909, 1923–1924, 29 L.Ed.2d 473 (1971).

These exceptions to the broad *Garmon* rule of pre-emption "highlight our responsibility in a case of this kind to determine the scope of the general rule by examining the state interests in regulating the conduct in question and the potential for interference with the federal regulatory scheme." *Farmer v. Carpenters*, 430 U.S. 290, 297, 97 S.Ct. 1056, 1062, 51 L.Ed.2d 338 (1977).

We begin our analysis with an examination of the nature of the State's interest. The statute involved in this case, V.A.C.S. Art. 5154d, is an exercise of the State's historic police power to regulate conduct in the interest of public safety. As set forth in the preamble,[3] the Legislature was attempting to guaranty the safety and welfare of the general public while at the same time safeguarding the rights of speech and assembly. The Legislature sought to accomplish this balancing of interests by prohibiting conduct which often led to the unwanted result, violence.

■ The State interest then is not simply in the punishment of violence, or in the enjoining of future violence, once it has occurred. The State has at least as great an interest, if not a duty, in the prevention of violence. In the context of a labor dispute, this statute is intended to prevent violence by regulating the number and location of pickets and by prohibiting the obstruction of traffic to and from the struck premises.

We, therefore, hold that the State interest represented by this statute is significant.

In *Allen-Bradley Local v. Wisconsin Board*, 315 U.S. 740, 62 S.Ct. 820, 86 L.Ed. 1154 (1942), the Supreme Court upheld the jurisdiction of a state labor relations board. The board had prohibited "mass picketing, threatening employees desiring to work with physical injury or property damage, obstructing entrance to and egress from the company's factory, obstructing the streets and public roads surrounding the factory, and picketing the homes of employees." *Id.* at 748, 62 S.Ct. at 825.

The Court held that the National Labor Relations Act "was not designed to preclude a state from enacting legislation limited to the prohibition or regulation of this type of employer or union activity." *Ibid.* In the absence of explicit congressional direction the Court was unwilling to infer that Congress intended to supersede a state's "historic powers over such traditionally local

---

**3.** The complete text of the preamble is:

"It is a matter of public knowledge that picketing as exercised by labor organizations is used not only as a means of expression of ideas to the public generally, but likewise as a means of coercion through the mere presence of a picket line. Picketing has been in many cases attended by force, violence, coercion, and conduct otherwise dangerous to the health, safety and general welfare of the people of Texas. In many cases it has been indiscriminately used against individuals and firms having no connection with the labor dispute out of which the picketing arose. While it is necessary to safe-

guard the fundamental American rights of freedom of speech and assembly, it is likewise necessary to ensure the safety and general welfare of the people and to guarantee their right to engage in their daily pursuits without unlawful interference from others, whether in the form of illegal coercion or conduct on the part of labor organizations or any other person or group.

"In order to safeguard the health, safety and general welfare of the people of Texas, it is necessary to regulate picketing." Acts 1947, 50th Leg., p. 239, ch. 138; V.A.C.S. Art. 5154d, historical note following Sec. 6.

matters as public safety and order and the use of streets and highways." *Id.* at 749, 62 S.Ct. at 825.

Thus this significant State interest was not intended by Congress to be displaced by the federal enactment. We do not end our analysis here, however. We must still examine the risk of interference with the federal regulatory scheme.

 Under the federal scheme the inquiry would focus upon the purpose and effect of the picketing. Under Section 7 of the Act, 29 U.S.C. Sec. 157, the inquiry would be whether the picketing was "for the purpose of collective bargaining or other mutual aid or protection." Under Section 8 of the Act, 29 U.S.C. Sec. 158, the inquiry would be whether the picketing had either an unlawful purpose or effect such as coercion of employees, or secondary boycott.

Under V.A.C.S. Art. 5154d the inquiry would be solely upon whether the required degree of obstruction took place. The purpose of the picketing and its effect upon either the employer or non-striking employees are irrelevant. In no way would the merits of the underlying labor controversy be implicated.

The risk of interference with the federal scheme would, therefore, be virtually non-existent. Balancing this negligible risk against the substantial State interest here, we cannot conclude that state court jurisdiction over this offense has been pre-empted by the federal act.

Two recent cases decided by the United States Supreme Court lend support to our conclusion. In *Farmer v. Carpenters*, 430 U.S. 290, 97 S.Ct. 1056, 51 L.Ed.2d 338 (1977), the Court held that a state tort action against union officials for intentional infliction of emotional distress was not pre-empted. In *Sears, Roebuck & Co. v. Carpenters*, 436 U.S. 180, 98 S.Ct. 1745, 56 L.Ed.2d 209 (1978), the Court held that the doctrine of pre-emption did not bar a preliminary injunction against trespassory picketing.

As the Court stated in *Sears*, "the history of the labor pre-emption doctrine in this Court does not support an approach which sweeps away state-court jurisdiction over conduct traditionally subject to state regulation without careful consideration of the relative impact of such a jurisdictional bar on the various interests affected." *Id.* at 188, 98 S.Ct. at 1752–1753.

In both *Farmer* and *Sears*, the Court found that the state interest in regulation outweighed the risk of interference with the federal regulatory scheme. We are confident that the Court would reach the same conclusion in the present case.

## II.

In his seventh ground of error, the appellant contends that V.A.C.S. Art. 5154d, Sec. 1(2), is unconstitutionally vague and overbroad. Because we believe that this statute can be construed in a constitutional manner, we overrule this contention.

 It is beyond question that peaceful labor picketing is activity protected by the First Amendment to the United States Constitution. *Thornhill v. Alabama*, 310 U.S. 88, 60 S.Ct. 736, 84 L.Ed. 1093 (1940). However, this protection does not confer the right to picket at any time in any manner. Reasonable "time, place, and manner" regulations are permissible restrictions on that right. *Police Department of Chicago v. Mosley*, 408 U.S. 92, 98, 92 S.Ct. 2286, 2291, 33 L.Ed.2d 212 (1972); *Cox v. Louisiana*, 379 U.S. 559, 85 S.Ct. 476, 13 L.Ed.2d 487 (1965).

As we view it, our task in this case is to construe this statute so as to render it constitutionally valid if at all possible. To do so we must construe it in such a manner that the statute is a reasonable "time, place, and manner" regulation. We believe it is possible to reach such a construction.

We begin with two statutes intended to aid in the construction of the statutes of this state. V.A.C.S. Art. 10 sets forth eight general rules for the construction of the civil statutes of the state. Most relevant for present purposes are subdiv. 6 which provides:

"In all interpretations, the court shall look diligently for the intention of the Legislature, keeping in view at all times the old law, the evil and the remedy."
and subdiv. 8 which provides:

"... [the Revised Statutes] shall constitute the law of this state respecting the subjects to which they relate; and the provisions thereof shall be liberally construed with a view to effect their objects and to promote justice."

In addition, in 1967 the 60th Legislature enacted the Code Construction Act, V.A. C.S. Art. 5429b–2. Although by its terms this act does not apply to statutes enacted by earlier legislatures,[4] two of its sections provide useful criteria for guiding our task under V.A.C.S. Art. 10:

"Sec. 3.01. In enacting a statute, it is presumed that

(1) compliance with the constitutions of this state and the United States is intended;

(2) the entire statute is intended to be effective;

(3) a just and reasonable result is intended;

(4) a result feasible of execution is intended; and

(5) public interest is favored over any private interest."

"Sec. 3.03. In construing a statute, whether or not the statute is considered ambiguous on its face, a court may consider among other matters the

(1) object sought to be attained;

(2) circumstances under which the statute was enacted;

(3) legislative history;

(4) common law or former statutory provisions, including laws upon the same or similar subjects;

(5) consequences of a particular construction;

(6) administrative construction of the statute; and

(7) title, preamble, and emergency provision."

As set forth in the preamble to V.A.C.S. Art. 5154d,[5] the Legislature was trying to accommodate private and public interests when it enacted this statute. The private interests are the "fundamental American rights of freedom of speech and assembly" as expressed by picketing activity. The public interests include the "safety and general welfare of the people" and "the right to engage in their daily pursuits without unlawful interference from others." Our task is to give effect to this accommodation of sometimes conflicting interests.

The appellant contends that V.A.C.S. Art. 5154d, Sec. 1(2), is vague because it contains no definition of "obstruction." The gist of this contention is that a reasonable person cannot know "when his or her presence on the picket line becomes an obstruction."

■ If we were unable to perceive a reasonable definition of the term "obstruction" we would agree that the statute is so vague that men of common intelligence must guess at its meaning and differ as to its application. However, because the Legislature has prohibited similar conduct in V.T. C.A. Penal Code, Sec. 42.03(b), we give the term "obstruction" the same definition in both statutes. Under our view of Art. 5154d, Sec. 1(2), then, what is prohibited is the rendering impassable or the rendering unreasonably inconvenient or hazardous the free ingress or egress to the struck premises.

We believe that this definition comports with the purposes of the Legislature as set forth in the preamble. By requiring that passage be severely restricted or completely blocked before a prosecution under this statute would lie we give ample breathing room for the exercise of First Amendment rights. At the same time, such a definition adequately protects the right of the public to have access to the struck premises.

We turn now to the contention made by amicus, the Texas AFL–CIO, that this statute is overbroad. Amicus urges that the phrase "any character of obstacle" criminalizes "mere momentary interferences which

---

**4.** See V.A.C.S. Art. 5429b–2, Sec. 1.02.

**5.** See note 3, supra.

are so temporary and incidental that they do not constitute imminent threats of violence or public disorder."

▐ As amicus reads the statute, the phrase "any character of obstacle" is synonymous with "any degree of obstacle." We assign a different meaning to that phrase. As we read it, "any character of obstacle" is synonymous with "any type of obstacle." In our view, then, this statute penalizes obstructions (as defined above) which are brought about by any means. Whether the obstacle is a human body, a log, or an automobile barricade, this construction still criminalizes only complete or unreasonably severe restrictions upon ingress or egress. For that reason we believe that, as we construe it, the statute is not overbroad.

In *Cameron v. Johnson*, 390 U.S. 611, 88 S.Ct. 1335, 20 L.Ed.2d 182 (1968), the United States Supreme Court dealt with a challenge to the Mississippi Anti-Picketing Law. In rejecting the contention that the law was void on its face because of overbreadth and vagueness, the Court upheld a statute with wording substantially the same as the construction we place upon Art. 5154d, Sec. 1(2).[6] Therefore, we believe that the construction we adopt satisfies the requirements of the United States Constitution.[7]

The appellant makes one further challenge to the validity of this statute. He urges that Art. 5154d, Sec. 1(2), violates due process of law because it does not contain a requirement of culpability. We find no merit to this contention.

V.T.C.A. Penal Code, Sec. 6.02, provides:

6. The complete text of the statute was:

"1. It shall be unlawful for any person, singly or in concert with others, to engage in picketing or mass demonstrations in such a manner as to obstruct or unreasonably interfere with free ingress or egress to and from any public premises, State property, county or municipal courthouses, city halls, office buildings, jails, or other public buildings or property owned by the State of Mississippi, or any county or municipal government located therein, or with the transaction of public business or administration of justice therein or thereon conducted or so as to obstruct or unreasonably interfere with free use of public streets, sidewalks, or other public ways adjacent or contiguous thereto.

" * * *

"(b) If the definition of an offense does not prescribe a culpable mental state, a culpable mental state is nevertheless required unless the definition plainly dispenses with any mental element.

"(c) If the definition of an offense does not prescribe a culpable mental state, but one is nevertheless required under Subsection (b) of this section, intent, knowledge, or recklessness suffices to establish criminal responsibility."

V.T.C.A. Penal Code, Sec. 1.03(b), provides:

"(b) The provisions of Titles 1, 2, and 3 of this code apply to offenses defined by other laws, unless the statute defining the offense provides otherwise; however, the punishment affixed to an offense defined outside this code shall be applicable unless the punishment is classified in accordance with this code."

▐ Since Sec. 6.02 is contained within Title 2 of the Penal Code, and since V.A.C.S. Art. 5154d does not otherwise provide, Sec. 6.02 supplies the requirement of culpability which the appellant claims is missing from Art. 5154d, Sec. 1(2). The appellant's contention is therefore incorrect. The offense does require a culpable mental state.[8]

### III.

As we construe this statute, in a criminal prosecution for its violation, the State must prove that a person

"2. Any person guilty of violating this act shall be deemed guilty of a misdemeanor and, upon conviction thereof, shall be fined not more than Five Hundred Dollars ($500.00), or imprisoned in jail not more than six (6) months, or both such fine and imprisonment."
See 390 U.S. at 612–613, n. 1, 88 S.Ct. at 1336, n. 1, quoting Miss.Code Ann. Sec. 2318.5 (Supp.1966).

7. We, of course, express no opinion concerning the constitutionality of any other part of the statute not before us in this case.

8. We note in passing that the complaint and information in this case alleged that the appellant had acted "intentionally and knowingly."

(1) singly, or in concert with others

(2) intentionally, knowingly or recklessly

(3) engaged in picketing in which

(4) pickets constituted or formed any character (type) of obstacle

(5) which by their persons or by the placing of vehicles or any other physical obstructions

(6) rendered impassable or unreasonably inconvenient or hazardous the free ingress to or egress from any entrance to any premises being picketed or to any other premises.

Because the State's proof failed to meet these requirements we reverse this case with an order that a judgment of acquittal be entered.

◼ The evidence indicated that no obstruction (as we have defined the term in Part II above) of ingress and egress ever took place. At most the proof showed that the appellant caused a momentary hesitation of a vehicle entering the struck premises. This simply is not enough to support a conviction under this statute as we construe it.

This case is apparently the first case to come before this Court involving a criminal prosecution for the violation of this statute. If this were the usual case we would simply reverse and remand for a new trial because the trial court simply charged the jury in the language of the statute. Since there was conflicting testimony from the witnesses concerning the degree of interference with ingress to the struck premises this Court would be unable to determine whether the evidence would have been sufficient under a charge tracking the statute as we construe it. It is not for this Court to resolve conflicts in the evidence.

However, in this case the State entered into evidence a videotape of the appellant's picketing activity. The conflicting testimony of the witnesses was but a recounting in their own words of the activity shown on the videotape. It is, therefore, unnecessary for us to resolve questions of credibility or to resolve questions of fact.

After viewing this videotape we are convinced that, as a matter of law, the appellant's activity does not constitute a violation of V.A.C.S. Art. 5154d, Sec. 1(2), either as charged in this case, or as we construe it.

For this reason we reverse the conviction and direct that an order of acquittal be entered.

CLINTON and TEAGUE, JJ., not participating.

ONION, Presiding Judge, concurring.

I concur in Part III of the court's opinion only. I agree the evidence is insufficient to support the conviction.